Argued and submitted April 27, reversed and remanded June 27, 2001

In the Matter of
Kasey Lee Metz, a Minor Child.

STATE ex rel STATE OFFICE FOR SERVICES TO
CHILDREN AND FAMILIES,
*Respondent,*

*v.*

Jack Edward METZ, Jr.,
*Appellant.*

97-442J; A111285 (Control)

In the Matter of
Kameron Jackson Metz, a Minor Child.

STATE ex rel STATE OFFICE FOR SERVICES TO
CHILDREN AND FAMILIES,
*Respondent,*

*v.*

Jack Edward METZ, Jr.,
*Appellant.*

00-95J; A111286

In the Matter of
Kameron Jackson Metz, a Minor Child.

STATE ex rel STATE OFFICE FOR SERVICES TO
CHILDREN AND FAMILIES,
*Respondent,*

*v.*

Susan Elaine METZ,
*Appellant.*

00-95J; A111341

In the Matter of
Kasey Lee Metz, a Minor Child.

STATE ex rel STATE OFFICE FOR SERVICES TO
CHILDREN AND FAMILIES,
*Respondent,*

*v.*

Susan Elaine METZ,
*Appellant.*

97-442J; A111342
(Cases Consolidated)

27 P3d 156

James A. Palmer argued the cause and filed the brief for appellant Jack Edward Metz, Jr.

Daphne E. Mantis argued the cause and filed the brief for appellant Susan Elaine Metz.

Judy C. Lucas, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

No appearance for minor children.

Before Edmonds, Presiding Judge, and Armstrong and Kistler, Judges.

EDMONDS, P. J.

**EDMONDS, P. J.**

Father and mother appeal from a judgment terminating their parental rights to their two children under ORS 419B.504. We reverse.

■ ■ The parties have two children, Kasey, born on August 18, 1997, and Kameron, born on February 18, 2000. Trial in this matter occurred in April 2000, and the trial court made its rulings terminating the parental rights of father and mother in July 2000. We review the record *de novo*. ORS 419A.200(5); ORS 19.125(3). Because the trial court had the opportunity to observe the witnesses and their demeanor, we give considerable weight to its findings. *State ex rel Juv. Dept. v. Jones*, 290 Or 799, 810, 626 P2d 882 (1981). However, we must ultimately be satisfied on the record before us that the state has proved its allegations under ORS 419B.504 and ORS 419B.506 by clear and convincing evidence. ORS 419B.521(1).[1] The requirement of *clear and convincing* evidence means that the record must disclose evidence that makes it "highly probable" that the parents are not presently able, and will not be able within a reasonable time, to meet their children's physical and emotional needs. *State ex rel SOSCF v. Hammons*, 170 Or App 287, 297, 12 P3d 983 (2000), *rev den* 331 Or 583 (2001).

In August 1997, the state first filed a juvenile dependency petition in Lane County alleging that Kasey was within the jurisdiction of the juvenile court because he was "at risk of harm due to the extensive history of domestic violence between his parents." The petition also alleged that K.H., mother's child from another relationship, had witnessed violent acts by father against mother. After a contested hearing, the court ordered Kasey temporarily committed to the State Office for Services to Children and Families (SCF) and placed in mother's physical custody; father was granted supervised visitation with Kasey and ordered not to reside in the family home without SCF's approval. After several custody hearings, the custody of K.H. was awarded to

---

[1] That is not to say that every fact must be proved by clear and convincing evidence, but that all of the evidence when considered together rises to that level.

K.H.'s father because of the domestic violence between father and mother. Father and mother were ordered to continue in individual and domestic violence counseling and to participate in comprehensive psychological evaluations at the direction of SCF.

In May 1998, SCF learned that mother had been charged with forging a drug prescription. Mother suffers from chronic endometriosis that causes her severe pain and there is a substantial history of mother using large amounts of pain medication and using fraudulent and deceitful efforts to obtain prescription drugs. SCF was aware of mother's prescription drug dependence, and although it offered mother services for that problem, she did not follow through successfully. In July 1998, SCF filed an amended jurisdictional petition alleging that mother's "misuse of prescriptions drugs and her incarcerations make her unavailable to provide a stable home for [Kasey]." After a hearing, the court removed Kasey from mother's physical care.

In August 1998, mother entered a six-month residential treatment program. She was discharged after three weeks for noncompliance with the program. To avoid incarceration as the result of the pending criminal charge arising out of the forged prescription, mother entered another residential treatment program in Baker City in late August. However, she was also terminated from that program in early November 1998 for noncompliance, and she returned to Eugene. The criminal court then ordered mother to participate in a program in Corvallis, which she successfully completed. However, SCF opposed mother's participation in that program, which it considered less rigorous than what mother's condition required, and it informed her that it would no longer seek to reunify the family, would no longer provide services, and "would like to explore the possibility of guardianship for the children" or adoption. Although the Corvallis program expected mother to undergo an extended stay in a structured, after-care program, mother said that she was unable to afford such a program and returned to Eugene, where she participated in another program. Meanwhile, SCF decided in January 1999 to petition for the termination of the parents' parental rights.

In February 1999, mother and father appeared at a Citizen Review Board hearing. At the time, SCF was no longer asking them to participate in any agency services. Father and mother expressed the desire to have Kasey returned to their custody. By April 1999, mother had completed all of the requirements of her criminal diversion program, and father had successfully completed three different programs. In May 1999, mother completed parenting classes. Nonetheless, SCF filed petitions to terminate their parental rights in June 1999.

In July 1999, mother started treatment with Dr. Klos, a chronic pain management physician on a referral from her then-treating physician, Dr. Bovee. According to Klos, mother came to him for the express purpose of getting off her pain medications. His initial plan of treatment was complicated by mother's becoming pregnant. She stayed on a stabilized dose of medication until October or November 1999, and then began to taper off her medication. By December or January, she reported that she was drug free. Klos did not have any more contact with mother from December 1999 until February 2000, and not until after Kameron was born. After Kameron was born, mother returned to Klos, reporting that she was unable to function because of her chronic pain. Klos put mother back on pain medication and was continuing to treat her at the time of trial.

Immediately after Kameron's birth on February 18, 2000, SCF filed a dependency petition that included allegations that his circumstances were endangered because "the child's mother has a long-standing problem with chemical dependency which has not been resolved despite her participation and sporadic success in various drug and treatment programs" and that "the child's mother and father present a threat of physical and/or mental injury to the child, in that subsequent to completion of domestic violence counseling, there have been more reported incidents of domestic violence between the child's mother and father." On February 25, 2000, SCF filed petitions to terminate mother's and father's parental rights to Kameron on the same grounds alleged in the petition concerning Kasey. The matters proceeded to trial in April 2000.

At trial, SCF offered the testimony of Dr. Hicks, a psychologist, who had seen mother's child K.H. 13 times from June 1998 through August 1999. Hicks testified that K.H. suffers from post-traumatic stress disorder as a result of observing the domestic violence between father and mother that occurred 1998. It also offered the testimony of Dr. Grosscup, a psychologist, who had evaluated father and mother after SCF's referral in January and February 1998. Grosscup diagnosed father with a significant anger management problem and an intermittent explosive conduct disorder. She diagnosed mother with an adjustment disorder with depressive and anxiety features. She believed that their disorders would interfere with their ability to parent. SCF also offered the testimony of Dr. Ewell, who evaluated mother while she was at the Baker City treatment facility in October 1998. He diagnosed her as suffering from prescription drug dependence and a borderline personality disorder, and said that her disorders would be very difficult to treat. His prognosis for successful intervention was poor, and he recommended against returning the children to mother's custody until she had "demonstrate[d] consistent progress over a prolonged period of time." Finally, SCF offered the testimony of Dr. Basham, a psychologist, who had evaluated mother in March 1999. He diagnosed polysubstance dependence in early full remission and a provisional diagnosis of borderline personality disorder. He performed a second evaluation on March 29, 2000. At that time, he confirmed a diagnosis of borderline personality disorder. Dr. Basham thought that there was a history of underreporting of events and denial by mother, and he did not believe that mother would be able to parent the children safely within the near future. He concluded that the minimum time needed to show improvement would be six to twelve months and that "[h]er immediate gains are not likely to persist."

In response to the state's position at trial, father and mother countered that although they had a history of domestic violence and inappropriate conduct, the problems that caused their children to be within the jurisdiction of the court were being dealt with successfully in the nine months before trial. They relied on evidence that they had been involved in

and had completed multiple treatment programs. Their position was that they were ready to have Kasey and Kameron returned to their custody subject to continuing with their treatment providers and being monitored by the court. In support of their position, they offered testimony from SCF representatives Teresa Vance and Olivia Forsberg, who testified that they had supervised visits between the parents and the children, that the children were appropriately treated by mother and father, and that the parents were bonded with them. Deborah Darnell, a drug and alcohol counselor, also testified. She had supervised mother's involvement in her after-care program since September 1999, and testified that she had observed no impairment in functioning during mother's participation in the program. She did not see any reason why mother could not parent her children.

Also testifying was Pamela Joffe, a psychologist, who had treated mother since 1997. Based on her contact with mother, Joffe saw no reason why mother could not now care adequately for her children. In addition, Charles Cudmore, a college-trained and certified drug counselor and the court liaison for the court-ordered diversion program in which mother participated, testified that mother had completed successfully the conditions of the court-ordered diversion program. He testified that, because of the number of people involved in providing treatment to mother, he did not believe that she could deceive a majority of her treatment providers for any length of time. He also said that the SCF caseworker in charge of the parents' case disagreed with the course of mother's treatment, and in his view, actively interfered with and adversely affected mother's progress. Mother's counselor in the Baker City residential treatment program testified that SCF refused to send Kasey to Baker City, despite the fact that mother's successful completion of the program required Kasey's presence for supervised parent/child therapy. Maribeth Carpenter, a drug counselor, testified that mother had attended all 25 sessions of her program and that all of her urinalysis tests were negative for drugs during that time. Finally, Dr. Schwartz, a psychologist and a specialist in anger management, testified that he had treated father and

mother since 1997. He believed that father had made significant progress in anger management. Both Joffee and Schwartz recommended against termination of mother's and father's parental rights.

The court issued written findings in support of its decision to terminate mother's and father's parental rights to Kasey and Kameron. As to mother, the court found, in part:

"[T]he court has no doubt that mother has some degree of pain associated with her endometriosis. However, the Court finds that Mother's use of narcotic pain medication is addictive in nature and goes beyond an effective therapeutic level. Specifically, the Court finds that while her current treating physician, Dr. Martin Klos, believes her use of narcotic pain medication to be appropriate, the Court does not for the reason that Dr. Klos's opinion is based upon the self reports of Mother and Father who have a history of lying to physicians and treatment providers. He has not conferred with or obtained records from Dr. Bovee and is content to trust Mother's and Father's self reports. The Court is not. The Court concludes that while Mother is able to abstain from the use of narcotic pain medication for months at a time, she relapses into active addiction and is unable to sustain her sobriety in a way that would allow [her] to successfully deal with her other problems and be an adequate parent to her children. Father resents Mother's addiction problem, has helped her obtain narcotic pain medication while in treatment and has not been entirely supportive of Mother's treatment efforts."

As to father, the court found, in part:

"Father has a history of domestic violence in his relationships with women. * * *

"* * * * *

"Father's relationship with Mother is also marred by domestic violence. * * *

"* * * * *

"Father was evaluated by Dr. Sally Grosscup on January 20, 1998. (Exhibit 10). She found him to have a significant anger management problem. She believed he was 'in complete denial that he has a problem, and consequently is

not interested in changing any of his behaviors' * * * He appears to have an intermittent explosive disorder that is in need of treatment and, until he acknowledges this problem and is motivated to correct it, repeated assaultive behavior will likely occur. At trial, Dr. Grosscup testified that her diagnosis is intermittent explosive disorder and adult conduct disorder. She concluded that Mother's and Father's chaotic lifestyle, characterized by lots of violence, is detrimental to a child's emotional development, putting the child at risk of substance abuse problems (for which Child in this case may already have a genetic predisposition), acting out behaviors and delinquency.

"* * * * *

"Father did better at attending the parenting classes, but does not appear to have internalized much of the material covered. The Court finds that the efforts of SOSCF to offer services to Father have been appropriate and sufficient given the hostility, deception and lack of progress Father and Mother have demonstrated since SOSCF became involved with their family. * * * Father also has failed to effect a lasting adjustment despite many months of treatment with Zak Schwartz and through Options for his domestic[ ] violence issues. It appears to the Court, based upon this and the fact that he appears committed to remaining in an unstable relationship with Mother, who he largely blames for the problems the family has with SOSCF, that the violence will continue and that no lasting adjustment can be effected."

The state alleges that mother's parental rights should be terminated under ORS 419B.504 and ORS 419B.506 and that father's parental rights should be terminated under ORS 419B.504.[2] ORS 419B.504 provides, in relevant part:

"The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not

_____

[2] On appeal, the state does not argue that mother's parental rights should be terminated under ORS 419B.506 (failure to provide for basic physical and psychological needs of the child for the six months before the filing of the petition).

likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:

"(1)   Emotional illness, mental illness or mental deficiency of the parent of such nature and duration as to render the parent incapable of providing proper care for the child for extended periods of time.

"(2)   Conduct toward any child of an abusive, cruel or sexual nature.

"(3)   Addictive or habitual use of intoxicating liquors or controlled substances to the extent that parental ability has been substantially impaired.

"(4)   Physical neglect of the child.

"(5)   Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make the return of the child possible or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected.

"(6)   Criminal conduct that impairs the parent's ability to provide adequate care for the child."

As was the trial court, we are faced on *de novo* review with conflicting opinions by expert witnesses about whether father's and mother's parental rights should be terminated. The trial court's written opinions demonstrate that it believed that mother continues to be deceitful about her drug use, that she is currently addicted to her medication, and that the pattern of violence between mother and father continues. Several events occurred after SCF filed its petitions to terminate in June 1999 that caused the court to arrive at its impressions and to agree with the opinions of SCF's expert witnesses. One event was that mother appeared to "nod off" during a visit with Kasey in June 1999, before she started treatment with Klos. On July 7 and on July 29, 1999, mother reported in applications for food stamps and emergency assistance that she needed to get away from a physically abusive situation with her husband. On August 15, 1999, a police officer responded to a report of an assault

involving an argument between mother and father. According to the report, mother and father argued verbally, and mother tried to leave the scene. Father threw a roll of plastic trash bags at mother's car, denting it. She went back into the house to call the police. In the house, father and mother had a physical altercation that included shoving, slapping and biting. Father then left the room and ultimately left the house. On his way out, he threw the garbage bags at mother again, hitting her in the stomach. Mother filed a police report about the incident. Finally, there is the matter of exhibit 62 — a tape recording of a conversation between mother and K.H.

■     The trial court believed that Exhibit 62 shows that mother continues to abuse her medication. During an evening recess of the termination trial in April 2000, mother called K.H. The telephone call was tape-recorded at the urging of the SCF case worker and apparently without mother's knowledge. Mother's conversation began with several minutes of clear, detailed discussion with K.H. in which she tracked with K.H.'s responses, asked appropriate questions and in general evidenced a solicitous and loving sensitivity to her son. In the middle of the conversation, her conversation began not to track or make sense for a few moments. At that point, K.H.'s father came onto the line, and he and mother engaged in a heated but controlled discussion that evidenced no indication of intoxication or impairment on the part of mother. Mother completed the conversation by saying "Good night" to K.H. and expressing her affection for him.

Both Joffe and Cudmore listened to the tape, and both testified that, during the period of time on the tape during which mother did not track, she sounded more like a person who was very tired after a grueling day in court than a person who was under the influence of drugs. In particular, Cudmore testified that, in his experience, someone who had ingested drugs to the extent that it would cause impairment could not mentally rebound in the manner that mother did in her discussion with K.H.'s father. Nevertheless, the trial court found:

> "The court's conclusion as to Mother's continued addiction to narcotic pain medication is supported by the tape-recording made during the course of trial (Exhibit 62) of a

conversation between Mother and [K.H.] In the course of the conversation, Mother lapsed into bizarre, inappropriate and incoherent statements characterized by slurred speech which the Court concludes to be a result of her intoxication on narcotic pain medication. The Court specifically finds the testimony of ACES counselor Charles Cudmore and Mother's current treating psychologist Dr. Pamela Joffe as to the reason for this bizarre speech unpersuasive. Each of them appear to the Court to have become advocates for Mother as opposed to objective reporters of fact. Each appeared to actively look for ways to rationalize Mother's dishonest behavior with them and to weave her negative behavior into their opinions that she has successfully overcome her addiction. The Court urges any appellate court reviewing this case to listen to this tape-recording."

As the trial court urged, we have listened to exhibit 62. At one point in the tape, mother's thought processes and speech are clearly impaired. There is testimony in various parts of the record regarding mother's fatigue and exhaustion during the treatment programs in which she participated that tends to corroborate the expert witnesses' explanation of the impairment. The impairment could be the result of taking the prescribed dose of medication, of fatigue, or of both. In our *de novo* review of the tape, we find that Joffe's and Cudmore's testimony, based on their expertise and extended contact with mother, presents a plausible explanation for mother's temporary impairment. Unlike the trial court, we are not persuaded that the tape recording is clear and convincing evidence of mother's alleged continued *abuse* of pain medication.

■      We turn now to the evidence of mother's continued medication and treatment for her chronic pain condition, which continued through the time of trial. As noted above, the trial court concluded that mother continues to use prescription medication to such an extent that it impairs her ability to parent. Mother's treatment provider is Klos. He is a licensed medical doctor and a board-certified anesthesiologist who currently specializes in chronic pain management. He explained that mother has a pseudo-addiction and not a prescription drug addiction:

"Patients have, very often as a matter of fact, have to survive when they are chronic pain patients. In order to receive

> their pain medications, they act like a drug addict would do. They go to multiple physicians. They will forge prescriptions. There [are] multiple behaviors that they will go through that other doctors will call addictive behaviors. In the pain management field, we have looked at the patient and their pain problem and their treatment as a whole. And that behavior is often termed as a pseudo addiction."

He perceived mother's behavior as having been mislabeled as addictive when she has actually been seeking just enough medication to deal with a legitimate problem of chronic pain. He believes that she may need medication in the future to help her function.

The state both expressly and implicitly disparages Klos's treatment of mother, arguing that he is supporting mother's addiction. We are not in a position to second-guess the medical wisdom of Klos's treatment on this record. The trial court appeared not to quarrel with the severity of mother's medical condition and the need for some amount of medication, and we agree with that assessment. However, it found, contrary to Klos's opinions, that father and mother have been deceitful in their reports to him and that mother will be unable to "sustain her sobriety in a way that would allow her to successfully deal with her other problems and be an adequate parent to her children." Where we part company with the trial court is in its assessment that the evidence is clear and convincing that mother's current use of medication prohibits her from acting as a fit parent at the present time and within the foreseeable future, and its apparent conclusion that mother must cease using the prescription drugs in order to be an adequate parent. When asked whether mother's present use of prescription medication prevents her from parenting her children, Klos replied, "I don't see any difficulty with it. If she can function on the job on pain medicine, I don't know why she couldn't be a mother." Later in his testimony, Klos said that he had no reservations about mother raising her children while taking medication under his supervision.

For us to agree instead with the trial court requires a demonstration by clear and convincing evidence that mother is currently unable to meet her children's needs because she is currently abusing her medication. As we have

said previously, exhibit 62—the evidence that appears to have led the trial court to that conclusion—does not rise to level of persuasiveness required by ORS 419B.521(1). Nor does the evidence that mother deceived former treatment providers to obtain prescriptions. None of mother's multiple treatment providers believes that mother is currently deceiving them about her drug use. Moreover, it appears that mother has been functional on the job and in her interactions with various doctors, counselors and SCF personnel after beginning treatment with Klos. In sum, we cannot conclude from the record that mother's current use of prescription medications under Klos's supervision makes it highly probable that she is currently unable to meet her childrens' needs.

■ Finally, there is the evidence of the July 1999 report by mother to Adult and Family Services and the August 1999 altercation, both of which suggest a continuing abusive relationship between father and mother as of the date of trial in April 2000. The question is how much weight to give to that evidence in light of the clear and convincing evidence requirement. Schwartz has been treating father and mother from 1997 to the time of trial. When informed of the garbage bag incident, he explained that the relationship between mother and father is a work in progress with its ups and downs and that it should be expected that, in times of stress, the parties may revert back to earlier patterns. However, he thought it significant that this incident did not escalate into more severe violence and that the incident in fact demonstrates that the parties are making progress. Notably, the parties both made efforts to leave the scene of the violence, and mother followed through in reporting the incident to the police rather than minimizing the violence as she had done in the past. Schwartz said that the incident should be viewed in the context of the entirety of their history, and he concluded:

> "[W]ell, this obviously has been a troubled couple. They have had problems in the last three or four years. Problems with substance abuse, problems with violence. No one is denying or hiding that that I know of. At least, they didn't deny it and hide it from me.

> "They have done a lot to put themselves essentially through a bunch of motivations toward keeping the family together and getting along better with each other and deal with the

problems that they are confronted with at a time when clearly, clinically they are showing improvement and dedication.

"Certainly, I have no question about their love and motivation as parents. Continuing on in the direction they have taken over the last two years, I think they are less—there's every chance they could construct a viable family with continued help, with continued progress in the directions they are going.

"You know, when I think of permanently removing, I think more of hopeless, helpless, not—not motivated, not improving, not completing programs. They are not the kind of criteria we are looking at in this case here."

If this were a case in which issues of fact turned solely on the credibility of one key witness, we would agree that the trial court is in the best position to determine the truth or the falsity of particular testimony. But this case presents a more complex problem because ORS 419B.504 requires us to make a judgment call about the parents' present fitness or ability to parent within a reasonable time by assessing the weight to be assigned to conflicting opinions by expert witnesses. In contrast to the opinions of Klos, Schwartz and Joffe,[3] all of whom had treated mother and father for extended periods of time, the trial court relied on the opinions of Basham, Grosscup and Ewell. However, their contact with father and mother is much more limited than the contact of Klos, Schwartz and Joffe, the parents' treatment providers, a fact that in our view raises a question as to the persuasiveness of their diagnoses and prognoses. Raising an additional question that bears on the weight to be given to their testimony is the parents' successful completion of multiple programs in the nine months preceding trial.

---

[3] Joffe testified that mother's borderline personality disorder did not prohibit her from functioning normally and that she had no reservations about mother's ability to act as a fit parent for Kasey and Kameron at this time. Although there is disagreement among mental health providers about whether borderline personality disorders are treatable, Joffee testified that mother's personality traits have diminished since 1997 and that she has consistently shown a desire to parent her children. She thought that Klos had a "good understanding" of mother's chronic pain condition and potential for addiction. Schwartz testified that the parents could be reunited with the children now, but that they should continue their counseling and be monitored for a period of time.

The trial court also believed that mother and father had manipulated the opinions of their service providers by concealing information from them and depriving them of the ability to perceive their true situation. It also found that Joffe and Cudmore had lost their objectivity and had become advocates for the parents. Certainly, there is evidence from which those inferences could be drawn by a trier of fact, but there are also contradictory inferences that arise not only from the testimony of the parents' experts, but that also are supported by the parents' other witness. Those competing inferences suggest that mother and father have made good-faith efforts to deal with the problems that infringe upon their ability to parent and that, while those problems or their propensity continue to exist in some degree, they are making progress and their current conditions do not prevent them from acting as fit parents at the present time.

Unlike the trial court, our review of the record does not persuade us that it is highly probable that four treatment providers, Klos, Joffe, Darnell and Schwartz, and the court liaison, Cudmore, have lost their objectivity or that their opinions are based on incomplete understandings. Nor can we point to any fact or set of facts that would necessarily compel the conclusion that mother continues to abuse her medication. Finally, the trial court's ultimate findings about father's and mother's present fitness to parent are not clearly established by the record. The parents' assertion that, for the nine months preceding trial they have turned their lives around is as plausible as it is that they continue in the behavior patterns that plagued their relationship before 1997.

This is a close case, and that is precisely the problem with affirming the termination of the parents' parental rights, which requires that the evidence make it highly probable that the state's allegations are true. Consequently, we conclude that the judgments must be reversed. However, as we have said before, our conclusion does not mean that the children must be returned immediately to the parents. The children are to remain within the jurisdiction of the court so long as the jurisdictional requirements are met, and, while working toward the goal of returning the children to the parents, SCF may take appropriate action, if warranted by intervening events, that is in the best interests of children.

Judgments terminating parental rights reversed; remanded for further proceedings.